**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | |
|---|---|
| **LARRY WAYNE GLADWELL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CIVIL ACTION NO. 1:12-01586** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order entered May 18, 2012 (Document No. 2.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has filed briefs in the matter.

The Plaintiff, Larry Wayne Gladwell, (hereinafter referred to as "Claimant"), filed an application for SSI on August 22, 2008,[1] (protective filing date), alleging disability as of September 8, 2007, due to "back problems, bipolar disorder, and schizophrenia." (Tr. at 14, 133-36, 152, 163.) The claim was denied initially and upon reconsideration. (Tr. at 69-71, 79-81.) On May 14, 2009, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 82-84.) The hearing was held on August 5, 2010, before the Honorable Joseph T. Scruton. (Tr. at 30-66.) By decision dated September 17, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-

---

[1] The undersigned notes that on the form Disability Report - Field Office, the Protective Filing Date is indicated as August 28, 2008, but the ALJ stated the protective filing date as August 22, 2008. (Tr. at 14, 152.)

26.) The ALJ's decision became the final decision of the Commissioner on March 19, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4.) Claimant filed the present action seeking judicial review of the administrative decision on May 18, 2012, pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§

404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three,

>four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the application date, August 22, 2008. (Tr. at 16, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from "degenerative disc disease of the lumbar spine; hypertension; bipolar disorder; and history of alcohol abuse - reportedly in remission for 3 years," which were severe impairments. (Tr. at 16, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform sedentary level work as follows:

> [T]he [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a). The [C]laimant would be able to lift and carry no more than 10 pounds; stand/walk for 2 hours in an 8-hour period; and sit for 6 hours in an 8-hour period. He would be allowed brief "in-place" shifting while in the seated position and brief standing for a few minutes arising from a seated position at approximately 30 minute intervals without distancing himself from the work station. He would need to avoid continuous handling or fingering with the bilateral upper extremities. He would need to avoid continuous climbing of ladders or scaffolds and exposure to unprotected heights. Due to limitations imposed by his mental impairment, he would be limited to routine and repetitive tasks with no interaction with the public and no more than occasional interaction with supervisors and co-workers. He would be able to adapt to occasional changes in the work setting.

(Tr. at 18, Finding No. 4.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 25, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a

ampoule sealer, addresser, and printed circuit board assembly touch-up screener, at the sedentary level of exertion. (Tr. at 25-26, Finding No. 9.) On this basis, benefits were denied. (Tr. at 26, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on May 9, 1964, and was 46 years old at the time of the administrative hearing, August 5, 2010. (Tr. at 25, 38, 133.) Claimant had a high school education and was able to communicate in English. (Tr. at 25, 38, 161-62.) In the past, he worked as a construction worker/laborer, garbage truck driver, and groundskeeper. (Tr. at 25, 61-62, 156-58, 164-71.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence of record, and will discuss it below as it relates to the undersigned's findings and recommendation.

*Anthony Correctional Center*:

Treatment notes reflect that on initial intake on November 16, 2005, Claimant reported problems with depression, his lumbar spine, and arthritis in his right knee, and that he was prescribed Paxil. (Tr. at 219-20, 223, 228.) He was continued on Paxil while in custody and it was noted that he had a history of a suicide attempt in August 2005. (Tr. at 220.)

*Princeton Community Hospital*:

Claimant underwent a MRI of the lumbosacral spine on April 27, 2007, for complaints of chronic low back pain with right radiculopathy since a motor vehicle accident years prior, with increased pain the past two years. (Tr. at 250-51.) The MRI revealed midline bulging discs at L4-L5 and L5-S1 and degenerative disc desiccation at L3-S1. (Tr. at 250.) Claimant also reported persistent neck pain and cervical spine x-rays on April 30, 2008, revealed congenital partial fusion of posterior facets at C5-C6. (Tr. at 236.) There also was a slight reversal of the cervical lordosis at the upper levels believed to represent chronic changes, with mild degenerative lipping and neural foraminal encroachment at C3-C4 bilaterally. (Id.) A follow-up MRI of the lumbosacral spine on May 17, 2008, revealed minimal degenerative disc dessication and bulging at L3-S1. (Tr. at 231.)

*Department of Human Services Mercer County*:

A form General Physical (Adults), dated May 9, 2008, as completed by Dr. Asbury, M.D., identified Claimant's incapacity or disability as depression and bulging discs at L4-L5. (Tr. at 253.) Dr. Asbury noted that Claimant was receiving treatment for depression and anxiety and was on prescribed medications. (Tr. at 254.) He opined that he was able to perform full time work after clearance with mental health professionals. (Id.) Claimant was referred to Dr. Greenberg for evaluation

7

of his back pain and to Dr. Riaz for evaluation of his depression. (Tr. at 252, 256-57.)

*Dr. Riaz Uddin Riaz, M.D.*:

On June 30, 2008, Claimant underwent a psychiatric evaluation by Dr. Riaz to determine eligibility for a medical card. (Tr. at 258-61.) Claimant was driven to the evaluation by his fiancé and reported that he was nervous, anxious, depressed, was irritable and easily upset, cried easily, preferred to be left alone, had anxiety attacks, and had a ten year history of depression that worsened when he was incarcerated. (Tr. at 258.) He reported that he was incarcerated twice in 1998, for sexual assault, and had been released for one and one half years. (Tr. at 259.) When incarcerated, he was diagnosed as bipolar. (Id.) Dr. Riaz observed that Claimant had moderately severe psychomotor retardation and appeared depressed and anxious. (Id.) Claimant reported that he had difficulty in crowds of people and could not concentrate. (Id.) He further advised that his quality of sleep was poor and that he had about four hours of sleep each night, with nightmares. (Tr. at 260.) His appetite was good. (Id.) Claimant required assistance to shower, bathe, and dress himself. (Id.) He did not cook, drive, visit neighbors or relatives, attend church, or perform any hobbies. (Id.) He was able to clean and shop, read, watch television, and visit friends occasionally. (Id.)

On mental status exam, Dr. Riaz noted that Claimant was depressed, nervous, and anxious; lacked difficulty relating to the examiner; was irritable; had a broad affect; exhibited spontaneous speech; and reported constant feelings of worthlessness, hopelessness, and uselessness. (Tr. at 260.) He reported two attempted suicides by cutting his writs, but no current suicidal plans; denied auditory hallucinations; and reported visual hallucinations consisting of things crawling across the floor. (Id.) Claimant was oriented to time, place, person, and date; had no difficulty in abstract thinking; was unable to name the current President or any previous President; was able to do two of four steps of the serial 7's; was able to repeat five digits forward and three digits backward; had fair recent and remote memory; had poor attention and concentration; and his insight and judgment were present. (Id.)

8

Dr. Riaz diagnosed bipolar disorder with mixed features and assessed a GAF of 48.[3] (Tr. at 260.) He opined that Claimant's prognosis was poor. (Id.) Dr. Riaz further opined that the combination of Claimant's emotional and physical problems rendered him incapable of gainful employment and that he would be unable to interact appropriately with co-workers and supervisors, or perform repetitive tasks at a sustained level. (Tr. at 260-61.) He thought that he would not be a suitable candidate for vocational rehabilitation and should be referred to a local mental health center for medication management. (Tr. at 261.)

*Jeffrey Greenberg, M.D.*:

Claimant underwent a neurological consultation by Dr. Greenberg on July 15, 2008. (Tr. at 265-67.) Claimant complained of chronic low back pain and reported that he had not worked since 2001. (Tr. at 265.) He was involved unsuccessfully in ten therapy sessions, as well chiropractic treatment, and reported that Tramadol did not help the pain. (Id.) Any activity exacerbated the pain, and reported that most of the pain resulted from a motor vehicle accident in 2002. (Id.) Claimant reported that he slept poorly and could not get into a comfortable position. (Id.) He also reported some neck pain and occasional numbness in his hands and legs. (Id.)

Examination revealed that Claimant was oriented, appropriate, and had a normal affect; had a negative straight leg raising testing in the lower extremities bilaterally; had normal motor strength, sensation, and reflexes in the upper and lower extremities bilaterally; had a normal gait and could toe and heel walk without difficulty; but had decreased range of motion in lumbar flexion significantly and had tenderness at about L1-L2. (Tr. at 266.) Dr. Greenberg noted that the MRI of the lumbar spine was normal except for some degenerative disc disease, slight desiccation, and minimal bulging. (Id.)

---

[3] The GAF Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

He saw no indication for any surgical intervention, but suggested facet injections or trigger point injections. (Id.) Claimant underwent a lumbar facet arthropathy on July 28, 2008, and August 15, 2008, by Dr. Greenberg, and tolerated the procedures well. (Tr. at 262-64.)

### *Tonya McFadden, M.A.*:

On September 23, 2008, Claimant underwent a mental status examination by Ms. McFadden at the request of the State Agency. (Tr. at 268-74.) Claimant drove himself to the examination and arrived on time, appropriately groomed and in appropriate attire. (Tr. at 268.) Ms. McFadden observed that he ambulated in a coordinated manner with no signs of disturbance of gait. (Id.) Claimant reported that he was applying for disability benefits due to mood swings, and that he was diagnosed with bipolar disorder and schizophrenia. (Tr. at 268-69.) He stated that he could "snap in a heartbeat." (Tr. at 269.) He reported depression, especially when he thought of his three children whom he had not seen since he went to jail in 1998. (Id.) He stated that the Paxil had been increased and that helped him somewhat. (Id.) He stated that he tried to fish fairly regularly with a 70-year old friend. (Id.) He also reported sleep disturbance with initial insomnia and nightmares and talking in his sleep; a changed appetite; recurrent thoughts of death, with a history of attempted suicide in 2004 and 2005, and a third attempt one and one half years ago by cutting his wrists; impaired concentration; feelings of worthlessness; that he was worried about his children; that he was easily provoked; and had a lack of energy. (Tr. at 269-70.)

On mental status exam, Ms. McFadden noted that Claimant was adequately groomed and appeared cooperative; his speech was relevant and coherent; he was fully oriented; his mood appeared somewhat down and his affect was restricted; his stream of thought was within normal limits; he denied any delusions, obsessions, or phobias; he denied any hallucinations; insight and judgment were fair; psychomotor behavior was normal; he denied suicidal or homicidal ideation or plan; his immediate memory was mildly limited, his recent memory was markedly limited, and his remote

memory was intact; and his concentration, persistence, and pace were normal. (Tr. at 271-72.) Ms. McFadden opined that Claimant's social functioning was mildly deficient, having noted that he was mildly distant, offered fair eye contact, and displayed no sense of humor. (Tr. at 272.) He reported that he snapped easily, went to the store once a month, and tried to visit with a friend a couple times a month. (Id.) He reported his activities of daily living to having included sitting on the couch, taking his medication, feeding and watering his girlfriend's three cats, watering plants, fishing with a friend one to three times a month, watching television, sweeping and mopping the one bedroom apartment, grilling on occasion, washing dishes, and trying to walk short distances three times a week. (Id.)

Ms. McFadden diagnosed mood disorder NOS and a history of alcohol dependence in remission for three years. (Tr. at 272.) She opined that Claimant's prognosis was fair with treatment and that he was capable of managing his finances. (Tr. at 273.)

*Marcel Lambrechts, M.D. - Physical RFC Assessment*:

On November 5, 2008, Dr. Lambrechts, completed a form Physical RFC Assessment, on which he opined that Claimant's low back pain limited him to performing medium exertional level work with occasional climbing ladders, ropes, or scaffolds; balancing; kneeling; crouching; and crawling; and frequently climbing ramps and stairs and stooping. (Tr. at 276-83.) He further opined that Claimant should avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. at 280.) He assessed these limitations due to Claimant's complaints of low back pain and evidence of degenerative changes at L3-S1. (Tr. at 281.) He determined that Claimant was partly credible and reduced Claimant's RFC slightly. (Id.) In reaching his opinion, Dr. Lambrechts reviewed Dr. Clarkson's notes of August 14, 2008; the MRI report dated May 17, 2008; Dr. Asbury's report dated May 9, 2008; x-rays from Princeton Community Hospital dated April 30, 2008, and the lumbosacral MRI dated April 27, 2007; and Claimant's reported activities of daily living. (Tr. at 283.)

*<u>Rosemary L. Smith, Psy.D. - Psychiatric Review Technique</u>*:

Dr. Smith completed a form Psychiatric Review Technique on November 14, 2008, on which she opined that Claimant's depression was a non-severe impairment that resulted in mild limitations in activities of daily living, social functioning, concentration, persistence, and pace, and no episodes of decompensation each of extended duration. (Tr. at 284-97.)

*<u>Bluestone Health Center - Dr. Hamza Rana, M.D. & Dr. Mark Clarkson, D.O.</u>*:

Claimant treated at Bluestone Health Center, primarily with Dr. Rana and Dr. Clarkson, from August 30, 2005, through April 20, 2010. (Tr. at 298-310, 380-400.) Claimant first reported to Bluestone Health Center on August 30, 2005, with complaints of nerve problems and depression. (Tr. at 380.) He had been treated with medication five years prior for depression. (Id.) Claimant denied hallucinations, but admitted to early morning awakenings and lack of interest in activities of daily living. (Id.) He also admitted to suicidal ideation but denied specific plan. (Id.) He attempted to cut his right wrist on August 16, 2005. (Id.) Claimant agreed to report directly to the Behavioral Medical Center at Princeton Community Hospital in view of the suicidal ideation. (Id.)

Claimant returned to the Clinic on December 14, 2006, at which time Dr. Rana noted that he was released from the correctional facility last month and needed a refill of Paxil. (Tr. at 381.) Claimant was treated for gastroesophageal reflux disease ("GERD") with Zantac 150mg, which was later changed to Nexium 40mg, and was told to have small frequent meals. (Tr. at 298-307, 382, 385-87.) Dr. Rana noted consistently that Claimant's depression was stable, that he denied any suicidal or homicidal ideation or plan, and that he continued to take his Paxil 40mg. (Tr. at 300, 303-07, 383, 385-87.) Dr. Rana noted on February 13, 2008, that Claimant's blood pressure had improved on Benicar 20, and the medication was increased to 40mg with 12.5mg HCTZ. (Tr. at 301, 389.) Dr. Clarkson changed the Benicar to Lisinopril 5mg and HCTZ 25mg on May 9, 2008, and his blood pressure was reported to have been well controlled on August 14, 2008. (Tr. at 390, 392.) It was noted on August

12

14, 2008, that his total cholesterol was elevated at 349, and a fasting lipid profile was ordered for the next visit. (Tr. at 300.) Dr. Rana diagnosed Hyperlipidemia on November 18, 2008, and prescribed Crestor 20mg. (Tr. at 299.) There was no mention of his cholesterol at his next visit on December 5, 2008. (Tr. at 298.)

Regarding Claimant's low back pain, Claimant rated the pain at a level six to seven out of ten on April 23, 2007, and reported that it was aggravated with activity. (Tr. at 306, 383.) Claimant denied recent trauma, but noted that he had an accident in 2003. (Id.) Examination revealed mild tenderness of the lumbosacral spine area with mildly limited flexion and lateral rotations secondary to pain. (Id.) Dr. Rana noted that Claimant had this pain for some time and that it was getting worse. (Id.) A MRI was ordered and Motrin 600mg and Flexeril 10mg was prescribed. (Id.) On June 4, 2007, Claimant reported that the pain was helped some with the Motrin but remained constant. (Tr. at 305, 385.) Dr. Rana continued the Flexeril but changed the Motrin to Ultram 50mg. (Id.) He had an appointment scheduled with Dr. Kropac. (Id.) Claimant reported on September 4, 2007, that the pain was helped with the Ultram, and his medications were continued. (Tr. at 304, 386.)

On December 4, 2007, Dr. Rana noted that Claimant saw Dr. Kropac for his back, who recommended that he continue the non-narcotic pain medications. (Tr. at 303.) Claimant was attending physical therapy and reported that he sometimes had low back pain. (Id.) He was continued on his medications and therapy. (Id.) On January 15, 2008, Claimant reported that he had finished his physical therapy and had great help from the TENS unit. (Tr. at 302, 388.) He reported continued pain which was helped with medication. (Id.) Dr. Clarkson noted Claimant's reports of severe back pain on May 9, 2008, following a recent boat ride. (Tr. at 390.)

On August 14, 2008, it was noted that Claimant had an appointment with Dr. Greenberg for a cortisone shot to his back. (Tr. at 300, 392.) On November 18, 2008, Claimant reported increased back pain with the steroid injections, TENS unit, and medications. (Tr. at 299.) Claimant did not think

13

that the Ultram was effective in controlling the pain and he was encouraged to convey his concerns to Dr. Greenberg who was treating his back condition. (Id.) On examination, Dr. Clarkson noted paraspinal muscle spasms in the back and directed that he follow-up with Dr. Greenberg. (Id.) He gave Claimant samples of Skelaxin to try for the muscle spasms. (Id.) On December 5, 2008, Claimant reported that the Skelaxin was not working for the spasms and that he continued to have pain and spasms in his back. (Tr. at 298.) Dr. Rana changed the Skelaxin to Flexeril 10mg and was advised not to work or drive after taking the Flexeril due to the sedative nature of the medication. (Id.) He was instructed to return to the clinic or to follow-up with Dr. Greenberg for any worsening or persistence of symptoms. (Id.)

On July 15, 2009, Claimant reported chronic low back pain and stated that he was unable to return to any type of work. (Tr. at 396.) Physical exam revealed no significant findings. (Id.) Dr. Clarkson gave him a sample of Lyrica 75mg for the back pain and continued all other medication. (Id.) On October 16, 2009, Claimant requested a different type of pain medication, non-narcotic in nature. (Tr. at 397.) Claimant stated that he was disabled and did not have any plans to return to work. (Id.) He indicated that he had been unemployed since 2002, when he was involved in two motor vehicle accidents. (Id.) Dr. Clarkson again noted his complaints of persistent back pain, which pain was worse on his right side as compared to the left side. (Id.) He changed his muscle relaxer to Chlorzoxaxone 500mg, his Ultram to Ultracet 325/37.5 and continued his other medications. (Id.) On January 18, 2010, Dr. Clarkson changed the Ultracet to Tramadol and Acetaminophen because Medicaid would not pay for the Ultracet, and also Chlorzoxazone 500mg. (Tr. at 399.) Finally, on April 20, 2010, the Ultracet was changed to Ultram 50mg and Motrin 600mg. (Tr. at 400.)

***Uma Reddy, M.D. - Physical RFC Assessment***:

On February 25, 2009, Dr. Reddy completed a form Physical RFC Assessment, on which she opined that Claimant's lumbar strain limited him to performing medium exertional level work with

occasional postural limitations, with the exception that he could never climb ramps or stairs. (Tr. at 311-18.) Dr. Reddy further opined that Claimant should avoid concentrated exposure to hazards. (Tr. at 315.) Dr. Reddy noted that though Claimant had allegations of a back strain and pain, there were no significant physical findings in support and that his pain primarily was subjective in nature. (Tr. at 316.) Dr. Reddy noted that Claimant was on medications for his allegations, had no neurological deficits, and exhibited a good gait. (Id.) Consequently, Dr. Reddy opined that Claimant was minimally credible with some physical limitations but did not meet a listing impairment. (Id.)

***James Binder, M.D. - Psychiatric Review Technique & Mental RFC Assessment***:

Dr. Binder completed a form Psychiatric Review Technique on February 28, 2009, on which he opined that Claimant's mood disorder NOS and alcohol dependency in remission resulted in mild limitations in activities of daily living, concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and no episodes of decompensation each of extended duration. (Tr. at 319-32, 333-46.) Dr. Binder also completed a form Mental RFC Assessment on which he opined that Claimant was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. at 347-50.) Dr. Binder opined that Claimant was not significantly limited in all other areas of functioning. (Id.) He noted that Claimant had "moderate deficits in the social domain," but appeared "capable of learning and performing basic work-like tasks." (Tr. at 349.)

***Princeton Community Hospital***:

Claimant underwent ten physical therapy sessions at Princeton Community Hospital from November 20, 2007, through December 13, 2007. (Tr. at 235, 241-42, 351-62.) At his initial session on November 20, 2007, it was noted that he was involved in a motor vehicle accident in 2002, that

resulted in low back pain and another motor vehicle accident in 2003, which resulted in increased low back pain, and intermittent pain since then. (Tr. at 241-42, 351-52.) He described his pain as throbbing in nature and rated the pain at a level six out of ten at best and a nine out of ten at worst. (Tr. at 241, 351.)The pain was aggravated by standing and walking and alleviated by resting, leaning, and sitting. (Id.) A progress report dated December 13, 2007, the date of his last session, indicated continued pain, a guarded gait pattern, and limited trunk range of motion. (Tr. at 235, 361.) Claimant was treated with a home exercise program, flexibility exercises, modalities, posture and body mechanics education, and strengthening exercises. (Id.)

### *Dr. Mark Clarkson, D.O. - Physical RFC Assessment*:

Dr. Clarkson completed a form Physical RFC Questionnaire on July 29, 2010, on which he opined that there were "no significant physical findings to support the severity of [Claimant's] complaints of pain." (Tr. at 363-67.) Based on Claimant's subjective complaints, Dr. Clarkson opined that Claimant could sit, stand, and walk for 30 minutes at a time, and would need a job that permitted shifting positions at will. (Tr. at 364-65.) Dr. Clarkson noted however, that Claimant had "no plan for returning to work." (Tr. at 365.) Dr. Clarkson opined that Claimant would need unscheduled breaks lasting from one half hour to one hour in length. (Id.) He could frequently lift and carry less than ten pounds, occasionally ten pounds, rarely 20 pounds, and never 50 pounds. (Id.) Claimant could frequently look down, turn his head, and look up; never climb ladders; rarely stoop or bend; and occasionally twist, crouch or squat, and climb stairs. (Tr. at 366.) Claimant had no problems with his upper extremities. (Id.) Dr. Clarkson noted that there were no sensory deficits and that Claimant reported increased back pain with cold or rainy weather. (Id.)

### *Dr. Riaz Uddin Riaz, M.D.*:

Claimant underwent a further evaluation by Dr. Riaz on October 26, 2009, to determine eligibility for a medical card. (Tr. at 368-71.) Claimant reported that he was anxious, depressed,

16

irritable, preferred to be left alone, had a stable mood if he stayed away from other people, and became depressed when he thought of his children whom he had not seen in nine years. (Tr. at 368.) Dr. Riaz noted that Claimant had poor eye contact, mild psychomotor retardation, appeared depressed and anxious, was wringing his hands and changed positions in his seat, and reported that he had difficulty in crowds of people and could not concentrate. (Tr. at 370.) Claimant reported his activities of daily living to have included requiring assistance to shower, bathe, and dress himself; needing help to cook; watching television; driving short distances on rare occasions; and visiting friends occasionally. (Id.) On mental status examination, Dr. Riaz noted that Claimant had no difficulty relating to the examiner; was depressed, anxious, and anhedonic; had a constricted affect; exhibited spontaneous speech; felt worthless, hopeless, helpless, and lonely most of the time; denied present suicidal thoughts or plans, as well as auditory or visual hallucinations; exhibited no evidence of delusions; was fully oriented; had no difficulty in abstract thinking; was able to recall three unrelated items after a brief delay; was able to name the current President and one previous President; was able to do four of four steps of the serial 7's; was able to repeat four digits forward and four digits backward; had fair recent memory and good remote memory; had fair attention and concentration; and had limited insight and judgment. (Tr. at 370-71.)

Dr. Rana diagnosed Bipolar Disorder and assessed a GAF of 50. (Tr. at 371.) He opined that Claimant's prognosis was poor and that he was incapable of gainful employment. (Id.) Dr. Riaz opined that Claimant was unable to interact appropriately with co-workers and supervisors, was unable to perform repetitive tasks at a sustained level, and was not a suitable candidate for vocational rehabilitation. (Id.) He recommended referral of Claimant to a local mental health center for medication management. (Id.)

Claimant's Challenges to the Commissioner's Decision

Neither the Commissioner nor the Claimant filed briefs in this matter, and Claimant's

Complaint fails to set forth any specific claims. Similarly, on his form "Request for Review of Hearing Decision/Order," Claimant did not state the bases upon which he requested that the Appeals Council review the ALJ's decision. (Tr. at 9.) The undersigned notes that Claimant was represented by counsel at all levels of review, including this appeal. As Claimant has not raised any specific arguments at this level of review, the undersigned additionally has reviewed the entire record to see if it comports with the substantial evidence standard.

Analysis.

    The ALJ found that Claimant's degenerative disc disease of the lumbar spine, hypertension, bipolar disorder, and history of alcohol abuse in remission, were severe impairments. (Tr. at 16.) In assessing Claimant's residual functional capacity, the ALJ noted that Claimant's allegation of disabling back pain was not credible in light of the degree of medical treatment required, the findings on examination, and the opinion evidence. (Tr. at 22-23.) The ALJ noted that Claimant was not prescribed narcotic pain medication, denied adverse side effects from medications, and provided inconsistent statements regarding his activities of daily activities. (Tr. at 22.) Regarding his mental abilities, the ALJ found that his ability to maintain activities of daily living, social functioning, concentration, persistence, and pace were moderately limited by his impairments. (Tr. at 16-18.) He found that he had experienced no episodes of decompensation of extended duration. (Tr. at 16.) Due to Claimant's mental impairments, including his depression and bipolar disorder, the ALJ limited him to work that involved only occasional interaction with supervisors and co-workers, no interaction with the public, and work that was limited to routine and repetitive tasks. (Tr. at 18.) Regarding Claimant's physical impairments, the ALJ limited him to performing sedentary work with postural, environmental, handling, and fingering limitations. (Tr. at 18.) In reaching this decision, the ALJ reviewed all the medical evidence of record and explained his assignment of weight to the various opinions. (Tr. at 18-25.) The ALJ acknowledged the opinions of the state agency medical consultants Drs. Lambrechts and

Reddy and assigned their opinions little weight as the additional evidence showed that Claimant was more limited than originally determined. (Tr. at 23.) He acknowledged the opinion of Dr. Smith and gave her opinion some weight and imposed additional limitations based on Claimant's testimony. (Id.) The ALJ also noted the opinions of Dr. Riaz and gave them little weight as they were not entirely supported by the record. (Tr. at 24.) He further noted the opinions of Dr. Asbury and Kathy Shafer, as well as the opinion of Claimant's treating physician, Dr. Clarkson. (Tr. at 23-25.) The ALJ gave Dr. Clarkson's opinion some weight, as Dr. Clarkson himself noted in his assessment that the physical findings did not support Claimant's alleged severity of pain and that Claimant did not intend to return to work. (Tr. at 24-25.) In assessing the opinion evidence, the ALJ properly considered the factors set forth in 20 C.F.R. § 416.927(d) (2010). Accordingly, the undersigned finds that the ALJ properly considered the opinion evidence in accordance with the Regulations and that substantial evidence supports the ALJ's decision

      The ALJ additionally thoroughly reviewed all of the medical evidence of record and considered the testimony of Claimant. (Tr. at 19-25.) The ALJ also complied with the applicable Regulations and case law in determining that Claimant did not have an impairment or combination of impairments that met or medically equaled a listed impairment, that Claimant was not entirely credible regarding the severity of his pain and other symptoms, and that Claimant was limited to sedentary work with certain limitations, and could perform a significant number of jobs in the national economy despite his severe impairments.

      For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

      The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**,

and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: June 26, 2013.

R. Clarke VanDervort
United States Magistrate Judge